IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 91-2260

_____


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

HUMBERTO HINOJOSA and CARLOS LERMA,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Texas
_____
(April 3, 1992)


Before WILLIAMS and WIENER, Circuit Judges, and LITTLE,[1] District
Judge

JERRE S. WILLIAMS, Circuit Judge:

Appellants Humberto Hinojosa and Carlos Lerma were both
convicted of numerous drug related offenses. Both appellants
insist the evidence was insufficient to support their convictions.
They also claim the trial judge erred in calculating their
sentences. Moreover, Hinojosa individually asserts he should be
granted a new trial due to improprieties in the selection of the
jury. We find appellants' arguments unpersuasive and affirm the
convictions and sentences.

_____

    1   District Judge of the Western District of Louisiana,
sitting by designation.

## I.  FACTS

Evidence was presented at trial that Carlos Lerma operated numerous businesses in the Houston area as a cover for an elaborate drug operation.  One of Lerma's businesses was an auto paint and body shop.  The body shop was run by Humberto Hinojosa who assisted Lerma in stripping down cars brought from Mexico and removing packages of marihuana concealed in the cars.  The packages were then boxed and distributed.  Much of the drugs was transported to Atlanta, Georgia.

In November 1985, Marion Meadows introduced Steven Miller to Hinojosa.  Miller agreed to transport marihuana in his car from Texas to Georgia.  Hinojosa supplied approximately 800 pounds of marihuana for the first trip to Atlanta.

Meadows and Miller followed Hinojosa's truck as they drove to Atlanta in Miller's car.  Upon arriving in Atlanta, Hinojosa told Miller and Meadows to check into a particular hotel.  At the hotel, a party unknown to Miller took Miller's car and Hinojosa's truck and unloaded the marihuana from the vehicles.  Later, money was delivered to the hotel.  Miller was instructed to count the money and Hinojosa told him he could keep all the one and five dollar bills.  The money totaled approximately $150,000.  Miller and Meadows returned to Texas with the money, and they delivered it to Lerma at his auto body shop.

Through January 1986, Miller made approximately five more trips to Atlanta, taking between 300 and 500 pounds of marihuana each time and returning with the money.  The procedures sometimes

2

varied, but the trips always involved the same people. After January of 1986, Miller and Meadows made two or three more trips, but they stopped after Meadows suspected he was under investigation. Meadows had been stopped at the Atlanta airport, and a Drug Enforcement Administration agent discovered $169,000 and six marihuana cigarettes in his duffle bag. After Meadows returned to Houston, he met with Lerma and Hinojosa to discuss the government's seizure of the money. Because of the incident at the airport, Miller and Meadows then stopped transporting marihuana for Hinojosa and Lerma.

In the summer of 1987, Miller again began driving marihuana from Houston to Atlanta because he needed the work. During the summer, Miller made four or five trips. On each trip he hauled approximately 300 pounds of marihuana, and on one trip, he transported six kilos of cocaine. Hinojosa accompanied Miller on two of the trips. Miller was arrested in Orange County, Texas for possession of less than an ounce of marihuana in July 1987. He then moved to Atlanta and ceased transporting drugs for Hinojosa and Lerma. He did, however, continue his association with the defendants. In fact, Miller purchased cocaine and marihuana from Hinojosa for the purpose of resale.

On March 27, 1988, Miller was again arrested. The charge was possession of marihuana and LSD. Following his arrest, Miller agreed to cooperate with the Georgia police. He told them that Hinojosa was his source and that Hinojosa would be coming to Atlanta. Upon Hinojosa's arrival in Atlanta, Miller was

temporarily released from jail so he could meet Hinojosa to receive a kilo of cocaine. Miller wore a "body-bug" during the transaction. After the transaction, Miller was returned to custody, and Hinojosa was arrested in his motel room.

Evidence was introduced to show that throughout the same time period, Lerma was involved in numerous other drug transactions. On two occasions in the summer of 1987, Lerma and Roger Solis transported between 500 and 900 pounds of marihuana from Laredo to Houston. Solis also drove two separate loads of marihuana to South Carolina. On the first trip to South Carolina, the marihuana was loaded at Lerma's house, and Solis drove in tandem with Ricardo Montalvan (a/k/a Valentin). On the second trip, Solis was stopped en route with the load and was arrested.

Testimony at trial indicated that one of Lerma's cocaine sources was his girlfriend, Jacquelyn Cruzco. In May 1988, Cruzco's house was searched pursuant to a valid search warrant. The police discovered $147,000 in cash, scales, drug paraphernalia, and marihuana at Cruzco's house. Lerma's briefcase was also searched, and the police found drug ledgers and a business card for an attorney named Lawrence Rothenberg. On the back of the card was a notation indicating that Lerma had paid $25,000 in legal expenses for Hinojosa. The briefcase also contained a memorandum regarding the events surrounding Hinojosa's arrest.

In August 1988, as a result both of information supplied by Miller and the arrest of Hinojosa, law enforcement officials in Houston obtained court-authorized wiretaps on several telephone

4

numbers utilized by Lerma, and they also conducted surveillance on his activities. Numerous incriminating conversations between Lerma, Lionel Sosa, Lee Hernandez, Solis, Montalvan, Vincente Rivera, and Cruzco were recorded. These conversations involved drug transactions and delivery of money. Approximately nine conversations were recorded between Lerma, Lee Hernandez, and Lionel Sosa, regarding money Hernandez allegedly owed Lerma for cocaine. Sosa testified at trial that Lerma recruited him to sell cocaine. Sosa agreed to assist Lerma by directing cocaine customers to him. In August 1988, Sosa put Lerma in touch with Lee Hernandez for the purpose of conducting cocaine and marihuana transactions.

In a separate conversation, Lerma told Montalvan that Lerma and two others had purchased 10,000-12,000 pounds of marihuana, and that Lerma intended to set aside 2000-3000 pounds for Montalvan. Another series of calls involved a 1000-pound marihuana transaction between Lerma and Montalvan. Lerma had purchased the marihuana from Felix Castillo. He had shown samples of the marihuana to Montalvan, but Montalvan rejected the marihuana. Lerma was en route to return the marihuana to Castillo when he was arrested by surveillance agents. A search of his car produced two samples of marihuana totalling forty pounds, a gun, and drug ledgers.

Hinojosa was indicted and convicted of conspiracy to possess with intent to distribute in excess of 1000 kilograms of marihuana and in excess of five kilograms of cocaine in violation of 21 U.S.C. § 846 and two counts of interstate travel in aid of

racketeering in violation of 18 U.S.C. §§ 2, 1952(a)(1), and 1953(a)(3). He was sentenced to a total prison term of 235 months, followed by five years supervised release. Lerma was indicted and convicted of 51 counts, involving: conspiracy to possess with intent to distribute in excess of 1000 kilograms of marihuana and in excess of five kilograms of cocaine in violation of 21 U.S.C. § 846; engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848; interstate travel in aid of racketeering in violation of 18 U.S.C. §§ 2 and 1952(a)(1); possession with intent to distribute in excess of 100 kilograms of marihuana in violation of 21 U.S.C. § 841(a)(1); possession with intent to distribute marihuana in violation of 21 U.S.C. § 841(a)(1); use of a telephone to facilitate the commission of a felony in violation of 21 U.S.C. §§ 846 and 843(b); carrying a firearm during a drug trafficking crime, in violation of 21 U.S.C. § 924(c)(1); conducting financial transactions in violation of 18 U.S.C. § 1956(a)(1)(B)(i); engaging in monetary transactions in violation of 18 U.S.C. § 1957; and investing illegal proceeds in violation of 21 U.S.C. § 854. He was sentenced to a total prison term of 300 months, followed by five years supervised release. Both appellants filed timely appeals.

## II. SUFFICIENCY OF THE EVIDENCE

Both Lerma and Hinojosa challenge the sufficiency of the evidence to support a portion of their conviction. We address each appellant's claim individually. In reviewing the sufficiency of the evidence, this Court views all evidence in the light most

6

favorable to the government with all reasonable inferences and credibility choices to be made in support of the jury's verdict. The evidence is sufficient if a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  United States v. Anchondo-Sandoval, 910 F.2d 1234, 1236 (5th Cir. 1990); United States v. Medina, 887 F.2d 528, 530 (5th Cir. 1989).

Both Hinojosa and Lerma have a difficult burden to overcome because they did not object to the sufficiency of the evidence at the trial level.  Without the objection, we extend even greater weight than is usual as to the jury's finding.  A review of Hinojosa and Lerma's sufficiency claims is "limited to the determination of whether there was a manifest miscarriage of justice.  Such a miscarriage would exist only if the record is devoid of evidence pointing to guilt."  United States v. Robles-Pantoja, 887 F.2d 1250, 1254 (5th Cir. 1989)(citations omitted).

Hinojosa challenges the sufficiency of the evidence with respect to his conviction for traveling and aiding and abetting travel in interstate commerce with the intent to distribute the proceeds of unlawful activity in violation of 18 U.S.C. § 1952(a)(1) and (2).[2]  The essential elements of a violation under

_____

[2]  "(a)    Whoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to--
        (1)   distribute the proceeds of any unlawful activity; or
        (2)   commit any crime of violence to further any unlawful activity; or
        (3)   otherwise promote, manage, establish, carry on, or

7

Section 1952(a) are: (1) travel in interstate or foreign commerce; (2) with the specific intent to distribute the proceeds of an unlawful activity; and (3) knowing and willful commission of an act in furtherance of that intent.  United States v. Logan, 949 F.2d 1370, 1380-81 (5th Cir. 1991), petition for cert. filed, (U.S. Mar. 2, 1992) (No.91-7478).  To convict Hinojosa for aiding and abetting an offense against the United States, the government must prove he was: (1) associated with the criminal venture; (2) participated in it as something he wished to bring about; and (3) sought by his actions to make it succeed.  United States v. Tullos, 868 F.2d 689, 694 (5th Cir.), cert. denied, 490 U.S. 1112, 109 S.Ct. 3171, 104 L.Ed.2d 1033 (1989).

Although Hinojosa traveled with Miller and Meadows to transport marihuana to Atlanta, he claims there is no evidence to support the conclusion that he actively participated in the distribution of proceeds.  Miller counted the money, and then Miller and Meadows drove to Houston to deliver the proceeds to Lerma.  Hinojosa maintains there is no evidence showing that he either delivered the proceeds or that he aided and abetted others in the interstate travel of the proceeds.

Although it is true that Hinojosa did not deliver the proceeds from Atlanta to Houston personally, it is not necessary under an

---

facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both."  18 U.S.C. § 1952 (1984).

8

aiding and abetting theory that he personally do so. This court has held that the requisite intent for Section 1952(a) may be inferred from a defendant's conduct immediately before and after travel. United States v. Abadie, 879 F.2d 1260, 1266 (5th Cir.), cert. denied, 493 U.S. 1005, 110 S.Ct. 569, 107 L.Ed.2d 563 (1989). Conduct before and after the actual travel may also be used to infer that Hinojosa aided and abetted the distribution of proceeds. Hinojosa provided the marihuana for the trip to Atlanta, and, once the proceeds were received in Atlanta, he instructed Miller to count the money, permitting Miller to keep the smaller bills. The money was then transported by Meadows and Miller to Lerma for whom Hinojosa worked. These overt acts are sufficient to manifest Hinojosa's desire to aid and abet in the distribution of proceeds of an unlawful activity. Accordingly, the record is not "devoid of evidence" of Hinojosa's guilt.

The attack by Lerma on the sufficiency of the evidence is much narrower. Lerma was convicted under the Continuing Criminal Enterprise statute ("CCE"),[3] which requires proof that a defendant

---

[3] "For purposes of subsection (a) of this section, a person is engaged in a continuing criminal enterprise if--
    (1)  he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and
    (2)  such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter--
        (A)  which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and
        (B)  From which such person obtains substantial income or resources.
21 U.S.C. § 848(c) (1981).

organized, supervised, or managed five or more persons in a continuing series of drug violations from which the defendant obtained substantial income. Lerma admits he organized, supervised, or managed Solis, Montalvan, and Sosa, but he contends the evidence is insufficient to show he had similar authority over anyone else.

The evidence, when viewed in the light most favorable to the government, indicates Lerma was Hinojosa's supervisor. Hinojosa worked directly under Lerma, assisting him by stripping down cars full of marihuana, delivering the marihuana to Atlanta, and ensuring the money was delivered back to Lerma. The most convincing evidence indicating Lerma supervised Hinojosa's affairs is the business card signifying that Lerma paid Hinojosa's legal fees after the 1988 arrest.

Because Lerma supervised Hinojosa and Hinojosa managed or supervised Miller and Meadows, Lerma is thus considered a manager, supervisor, or organizer of Miller and Meadows as well. Lerma argues he is not responsible for the people who worked for Hinojosa, but this argument defies common logic. The CCE must not be rendered meaningless by permitting the head of a drug enterprise to insulate himself from liability by merely delegating authority to several lieutenants. The specific wording of the statute compels this Court to include delegated authority within the definition of the CCE statute. No where in Section 848(c) does it say the defendant must "directly" or "personally" organize, supervise, or manage five people. Moreover, the terms "organize,"

10

"supervise," or "manage" are used disjunctively in the statute. Lerma wants us to assume the drafters intended the words "supervise" and "manage" to be synonymous. This is an assumption we will not make. "[T]hese terms should be applied in their ordinary sense as understood by the public or the business community." United States v. Butler, 885 F.2d at 200. The term "manage" suggests delegated authority while "supervise" connotes one-on-one guidance.

The caselaw firmly supports the statutory wording and purpose. "[A] defendant may not insulate himself from CCE liability by carefully pyramiding authority so as to maintain fewer than five direct subordinates." United States v. Ricks, 882 F.2d 885, 891 (4th Cir. 1989), cert. denied, 493 U.S. 1047, 110 S.Ct. 846, 107 L.Ed.2d 841 (1990). See also, United States v. Phillips, 664 F.2d 971, 1034 (5th Cir. Unit B 1981), cert. denied, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354, and cert. denied, 459 U.S. 906, 103 S.Ct. 208, 74 L.Ed.2d 166 (1982)("Mere delegation by Myers of the authority to personally hire crew members to the ship's foreman does not detract from Myers' ultimate status as organizer"); United States v. Butler, 885 F.2d 195, 200-01 (4th Cir. 1989)("Nor need the defendant have personal contact with the five persons because organizational authority and responsibility may be delegated"); United States v. Alvarez, 860 F.2d 801, 816 (7th Cir. 1988), cert. denied, 490 U.S. 1051, 109 S.Ct. 1966, 104 L.Ed.2d 434, and cert. denied, 493 U.S. 829, 110 S.Ct. 97, 107 L.Ed.2d 60 (1989) ("We find that mere delegation of authority does not detract from [the

11

defendant's] ultimate status as organizer"); <u>United States v. Becton</u>, 751 F.2d 250, 255 (8th Cir. 1984), <u>cert. denied</u>, 472 U.S. 1018, 105 S.Ct. 3480, 87 L.Ed.2d 615 (1985) ("Furthermore, the government need not prove that the supervisor had personal contact with each person"). Under the proper statutory interpretation, the evidence clearly is sufficient to sustain Lerma's conviction under the CCE.


### III. JURY SELECTION

Hinojosa maintains he should be granted a new trial because he was denied a fair trial due to two improprieties in the jury selection process. He first asserts that the trial judge erred in refusing to strike Ms. Morgan from the jury panel because she was allegedly biased against drug-related crimes. Ms. Morgan's son, although drug-free at the time of trial, had had a drug problem as a teenager, and Ms. Morgan expressed some concern as to whether she could put the experience aside during the trial. When the trial judge asked Ms. Morgan if she could decide a case based on the evidence despite her son's past problems, she stated, "I feel like I could in one way, and another way I'm not sure. I'm being truthful with you, Judge." When the government questioned Ms. Morgan, the following exchange occurred:

  Government:  Do you understand that you will be under oath to follow the law and the Judge's instructions? Can you do this?

  Morgan:  Yes.

  Government:  We're all products of our upbringing and our hates and dislikes and likes. But

                              setting those aside and deciding the facts
                              of the case, can you do that?

     Morgan:              Yes, I can.

Hinojosa attempted to have the juror struck because of bias, but the trial judge denied the motion.  As a result of the ruling, Hinojosa used one of his peremptory challenges on Ms. Morgan, which meant he was unable to use it on another venireman.  We affirm the trial court's ruling.

     The Sixth and Fourteenth amendments of the U.S. Constitution guarantee all criminal defendants the right to a trial by an impartial jury.  The implementation of this guarantee is entrusted to the trial court.  King v. Lynaugh, 850 F.2d 1055, 1058 (5th Cir. 1988)(en banc), cert. denied, 488 U.S. 1019, 109 S.Ct. 820, 102 L.Ed.2d 809 (1989), and cert. denied, 489 U.S. 1093, 109 S.Ct. 1563, 103 L.Ed.2d 930 (1989).  We grant broad discretion to the trial judge in making determinations of impartiality and will not interfere with such decisions absent a clear abuse of discretion. United States v. McCord, 695 F.2d 823, 828 (5th Cir.), cert. denied, 460 U.S. 1073, 103 S.Ct. 1533, 75 L.Ed.2d 953 (1983); United States v. Jones, 712 F.2d 115, 121 (5th Cir. 1983); United States v. Allred, 867 F.2d 856, 869 (5th Cir. 1989).

     The decision to grant such power to the trial judge is based on the acknowledged advantage the trial judge has in observing the demeanor and credibility of any potential juror.  Wainwright v. Witt, 469 U.S. 412, 428, 105 S.Ct. 844, 854, 83 L.Ed.2d 841 (1985) ("[S]uch a finding is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province);

13

<u>Wicker v. McCotter</u>, 783 F.2d 487, 493 (5th Cir.), <u>cert. denied</u>, 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986) ("[D]eterminations of juror bias depend in great degree on the trial judge's assessment of the potential juror's demeanor and credibility, and on his impressions about that venireman's state of mind").

In the present case, the trial judge questioned the venireman himself and then listened as both sides questioned her as well. At the conclusion of this process, he believed Ms. Morgan's assertion that she would follow the law and his instructions. Ms. Morgan's candor on the subject bolsters her later assertions that she would set aside her "hates and dislikes and likes." The present case involves a less extreme potential for bias than <u>Celestine v. Blackburn</u>, 750 F.2d 353 (5th Cir. 1984), <u>cert. denied</u>, 472 U.S. 1022, 105 S.Ct. 3490, 87 L.Ed.2d 624 (1985), in which we affirmed a trial judge's refusal to strike a juror for bias even though the juror knew both the prosecuting attorney and the granddaughter of the murder victim. If the trial judge in <u>Celestine</u> did not abuse his discretion in believing the claims of impartiality, then the trial judge in the present case certainly did not abuse his discretion either.

Hinojosa's second claim regarding the selection of the jury is that the government denied him equal protection of the law by using its peremptory challenges to exclude three black prospective jurors solely because of their race in violation of <u>Batson v. Kentucky</u>, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The government claims the objection was not timely made because Hinojosa raised

14

his <u>Batson</u> claim only after the venire was dismissed and after the jury was sworn and excused for the day.  Although the caselaw supports the government's contention,[4] we address the issue on the merits because the trial judge ruled on the <u>Batson</u> claim.

The government gave the following reasons for striking the respective jurors:

> Panelist No. 1 - The government felt he was both slow in answering the questions and not paying attention during voir dire.  The government was also concerned because the panelist stated he had twelve years of formal education but did not state he had completed high school.
>
> Panelist No. 16 - The government struck this juror because he had not completed high school.
>
> Panelist No. 23 - The government struck this juror because he, too, had not completed high school.

The government's concern over lack of education and inattentiveness was due to the complex legal issues involved in this case.  The trial involved 58 counts, including continuing criminal enterprise, money laundering, and structuring financial transactions. Additionally, it required the jury to determine whether Lerma's vast properties and assets were subject to criminal forfeiture as proceeds of unlawful activity. The government was apprehensive that these particular veniremen would have difficulty understanding the complexities involved.   The district court accepted the government's reasons for its use of peremptory strikes on these veniremen and denied the <u>Batson</u> motion.

---

[4]    <u>Jones v. Butler</u>, 864 F.2d 348, 370 (5th Cir. 1988), <u>cert. denied</u>, 490 U.S. 1075, 109 S.Ct. 2090, 104 L.Ed.2d 653 (1989) ("The Supreme Court's analysis in <u>Batson</u> presumed that an objection would be made promptly, probably before the venire was dismissed").

As with the motion to strike for cause, we pay great deference to the trial judge's decision regarding a <u>Batson</u> motion.  The trial judge's decision rests upon a credibility determination, and, thus, we interfere with that decision only if it is clearly erroneous or an abuse of discretion.  <u>United States v. Terrazas-Carrasco</u>, 861 F.2d 93, 94 (5th Cir. 1988); <u>United States v. Clemons</u>, 941 F.2d 321, 324 (5th Cir. 1991).

Once Hinojosa made a prima facie showing that the government's peremptory challenges were based on race, the burden shifted to the government to articulate a race-neutral reason for its challenges. <u>United States v. Clemons</u>, 941 F.2d at 323.  "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason given by the prosecutor will be deemed race-neutral." <u>Id</u>. at 325.  The government's reason need not rise to the level justifying a challenge for cause, <u>United States v. Roberts</u>, 913 F.2d 211, 214 (5th Cir. 1990), <u>cert. denied</u>, ___ U.S. ___, 111 S.Ct. 2264, 114 L.Ed.2d 716 (1991), and valid reasons for exclusion may include intuitive assumptions.  <u>United States v. Terrazas-Carrasco</u>, 861 F.2d at 94.

This Court has previously held that a disinterested demeanor and inattentiveness are valid, race-neutral reasons for excluding a venireman from jury service. <u>Moore v. Keller Industries, Inc.</u>, 948 F.2d 199, 202 (5th Cir. 1991).  We now hold that a trial judge does not abuse his discretion by allowing exclusion of a venireman by peremptory challenge if that venireman's education is insufficient when taking into account the legal issues to be

16

presented. Of course, whether a venireman's education is insufficient is a factual determination made by the judge. In the present case, we cannot hold that the trial judge's determination was clearly erroneous.

IV. LERMA'S SENTENCE

Lerma asserts that there are two errors in the sentence he received and that this Court should reverse and remand for resentencing. We are unable to consider his request because Lerma has not provided this Court with a record of the sentencing hearing, and no justification is given for not doing so. The rules of appellate procedure require the appellant to provide the record,[5] and our caselaw has consistently followed this rule. United States v. Juarez-Fierro, 935 F.2d 672, 675, n.1 (5th Cir.), cert. denied, ___ U.S. ___, 112 S.Ct. 402, 116 L.Ed.2d 351 (1991)("Since the appellant failed to order the parts of the record regarding the swearing of the second petit jury, we cannot review his claim"); United States v. Alfaro, 919 F.2d 962, 966, n.16 (5th Cir. 1990)("If a defendant reasonably expects us to overturn the factual findings of the trial court, he should strive to provide a thorough evidentiary record on the factual issues")(emphasis in

---

[5] "(1) Within 10 days after filing the notice of appeal the appellant shall order from the reporter a transcript of such parts of the proceedings not already on file as the appellant deems necessary, subject to local rules of the courts of appeals. . . . (2) If the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence, the appellant shall include in the record a transcript of all evidence relevant to such finding or conclusion." Fed. R. App. P. 10(b).

17

original); <u>United States v. O'Brien</u>, 898 F.2d 983, 985 (5th Cir. 1990)("It is appellant's responsibility to order parts of the record which he contends contain error and his failure to do so prevents us from reviewing this assignment of error"); <u>Brookins v. United States</u>, 397 F.2d 261, 262 (5th Cir.), <u>cert. denied</u>, 393 U.S. 952, 89 S.Ct. 377, 21 L.Ed.2d 364 (1968)("This appellate court `[C]an only take the record as it finds it, and cannot add thereto, or go behind, beyond, or outside it . . .'") (quoting 4A C.J.S. Appeal and Error § 1206 at p. 1333). The rulings of other circuits comport with our rulings on the importance of the inclusion of the record.[6] Thus, to maintain the integrity of the rules and the appellate process, we properly decline to review controversies in which the record is not supplied to us.

## V. HINOJOSA'S SENTENCE

Hinojosa, like Lerma, claims the district court erred in computing his sentence, but, unlike Lerma, Hinojosa provided this Court with a record of his sentencing hearing. Consequently, we are able to evaluate whether the district court erred.

---

[6] <u>See</u> <u>United States v. Durrive</u>, 902 F.2d 1221, 1232, n.8 (7th Cir. 1990)("We reiterate the requirement that counsel provide this court with the district court's specific findings of fact relevant to sentencing . . ."); <u>United States v. Mobile Materials, Inc.</u>, 881 F.2d 866, 878 (10th Cir. 1989). <u>cert. denied</u>, 493 U.S. 1043, 110 S.Ct. 837, 107 L.Ed.2d 833 (1990)("Appellants have made no effort to provide us with a statement envisioned by Fed.R.App. 10(c), and it is the responsibility of counsel . . . to insure that a complete record is available for our review"); <u>United States v. Johnson</u>, 584 F.2d 148, 156, n.18 (6th Cir. 1978), <u>cert. denied</u>, 440 U.S. 918, 99 S.Ct. 1239, 59 L.Ed.2d 469 (1979) ("It is the responsibility of appellants to insure inclusion in the record of all trial materials upon which they intend to rely on appeal").

18

For sentencing purposes, the district court imposed a two level increase of Hinojosa's offense level because "the defendant was an organizer, leader, manager, or supervisor in any criminal activity."   U.S.S.G.  §  3B1.1(c).   "Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others."   Application Note 3, U.S.S.G. § 3B1.1(c).   Unlike a finding of guilt, the facts necessary to support an adjustment in sentencing must only be proved by a preponderance of the evidence. United States v. Alfaro, 919 F.2d at 965.   This Court will not reverse findings of fact unless they are clearly erroneous.  United States v. Mir, 919 F.2d 940, 943 (5th Cir. 1990).

Hinojosa claims the evidence is insufficient to support a finding that he was a "leader."  He alleges the evidence shows only that he was a participant with Miller and Meadows, but not their leader.   In contrast to this claim, the following evidence established at trial supports the district court's finding of Hinojosa as a leader: (1) Hinojosa supplied the marihuana for the trips to Atlanta; (2) he was involved with the men who picked up the marihuana and paid for the load; (3) he chose the hotel where they met; (4) he directed Miller to count the money and gave Miller permission to keep the small bills; and (5) when Meadows was

19

stopped with money in the Atlanta airport, it was Hinojosa and Lerma who met with Meadows to discover what happened to the money. With this preponderance of the evidence supporting the finding of Hinojosa as a leader, we hold that the district court's ruling was not clearly erroneous.

## VI.   CONCLUSION

We hold the convictions of Hinojosa and Lerma must be upheld. There were no improprieties in the selection of the jury, and the evidence was sufficient to support all convictions.  With respect to Hinojosa, the trial judge did not err in calculating his sentence, and with respect to Lerma, we do not address the issue of error in calculating his sentence because Lerma did not provide us with the record of the sentencing proceedings.  Finding no error, we affirm the convictions and sentences.

AFFIRMED.