**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

**No. 93-8894**

---

**UNITED STATES OF AMERICA,**

Plaintiff-Appellee-
Cross-Appellant,
Cross-Appellee,

**VERSUS**

**MIKE MOELLER and**
**PETER THOMAS MCRAE,**

Defendants-Appellants-
Cross-Appellees,

**and BILLIE B. QUICKSALL**

Defendant-Cross-Appellee
Cross-Appellant.

---

Appeal from the United States District Court
For the Western District of Texas
April 8, 1996

Before POLITZ, Chief Judge, HILL[1], and DeMOSS.

DeMoss, Circuit Judge:

Defendants Mike Moeller, Peter McRae and Billie Quicksall were convicted on multiple counts of bribery, misapplication of state funds, and a single count of conspiracy to commit those unlawful acts. Defendants appeal their convictions, challenging the sufficiency of the evidence, the admission of certain evidence, and

---

[1] Circuit Judge of the Eleventh Circuit, sitting by designation.

the prosecution's exercise of peremptory strikes against minority jurors. The government cross-appeals, challenging the district court's application of the sentencing guidelines. We affirm the district court on the issues raised by the defendants' appeal. We affirm in part, and reverse and remand in part, on the points raised by the government's cross-appeal.

## I. BACKGROUND

This appeal concerns allegations of deep-rooted corruption in the Texas Department of Agriculture (TDA) and the Texas Federal Inspection Service (TFIS). Defendants Mike Moeller, Peter McRae and Billie Quicksall are all former officials of those Texas agencies. The government charged that Moeller, McRae and Quicksall misused their positions with TDA and TFIS by authorizing the award of publicly-funded sham contracts to political consultants Robert Boyd and Russell Koontz.[2] This allegation forms the heart of the counts alleging that the defendants misapplied state agency funds. 18 U.S.C. § 666(a)(1)(A) (prohibiting intentional misapplication of state funds by state officials). The government further charged that the defendants either (1) awarded the sham contracts to Boyd and Koontz to compensate Boyd and Koontz for raising political contributions to support the political campaigns of Moeller, and then later, Texas Commissioner of Agriculture Jim Hightower, or (2) that the campaigning and resulting contributions were a kickback for the illicit contracts. This allegation forms the heart of the

_____

[2]Boyd and Koontz were indicted along with Moeller, McRae and Quicksall, but their cases were severed prior to trial.

bribery counts. 18 U.S.C. § 666(a)(1)(B) (prohibiting state officials from accepting or agreeing to accept anything of value with the intent to be rewarded or influenced in connection with any state agency transaction or series of transactions).[3]

From 1985 until 1990 defendant Moeller was the second in command at TDA, serving as deputy commissioner under then Commissioner of Agriculture Jim Hightower. Defendant McRae worked closely with Moeller, holding positions as Moeller's special assistant at TDA, and as the associate director of the TFIS.[4] Defendant Quicksall also worked for Moeller, holding various positions at both TDA and TFIS.

In the summer of 1987, defendant Mike Moeller decided to "test the waters" to determine whether he could successfully mount a campaign to replace then Texas Commissioner of Agriculture Jim Hightower, who was at that time considering a campaign for a congressional seat. Moeller, McRae, Quicksall, and several other TDA or TFIS officials, met on several occasions at an Austin restaurant for the purpose of planning a strategy. One approach discussed was the formation of a political action committee (PAC)

---

[3]Both the misapplication statute, 18 U.S.C. § 666(a)(1)(A), and the bribery statute, 18 U.S.C. § 666(a)(1)(B), require that the funds misapplied or the series of transactions affected be valued at more than $5,000, and that the state agency involved receive more than $10,000 in federal funds in any one year. None of the parties dispute that the prerequisites for application of § 666 have been met in this case. Some of these issues were decided in the previous appeal of this case. **United States v. Moeller**, 987 F.2d 1134 (5th Cir. 1993).

[4]TFIS was created by cooperative agreement between the United States Department of Agriculture and TDA.

to enhance Moeller's name recognition.  In this regard, Moeller met with Harold Bob Bennett in August 1987.  Bennett testified that the idea of a PAC to support Moeller's campaign was "definitely a concept at that time."

Shortly thereafter, a PAC dubbed Building Texas Agriculture (BTA or BTA PAC) was formed.  Multiple witnesses testified that the purpose of the PAC was to gather a war chest for Moeller's potential campaign.  BTA literature listed Moeller as the PAC's founder.  McRae opened the BTA bank accounts, made deposits, and was authorized to spend the PAC funds.  Moeller's secretary, Nelda Trevino, kept the checks and financial records of BTA.  Moeller himself conceded at trial that the BTA PAC became a vehicle for reimbursing his political expenses.

Moeller, McRae and Quicksall were all familiar with political consultants Robert Boyd and Russell Koontz.  Boyd and Koontz, both former TDA officials, have been involved in Texas agriculture, and particularly in the politics of Texas agriculture, for several decades.  Beginning in the fall of 1987, Boyd and Koontz became actively involved in soliciting contributions to the BTA PAC for Moeller's benefit.  Boyd's address was listed as the BTA PAC's mailing address.  In June 1988, the same parties formed a non-profit corporation, the Building Texas Agriculture Education Fund, which was also intended to enhance Moeller's name recognition, and they began soliciting contributions for that organization as well. Multiple donors testified that they considered contributions to either the PAC or the education fund to be political contributions

4

to Moeller's potential campaign.  Funds contributed to the two BTA funds were sometimes commingled.

Between August 1987 and May 1990, Moeller, McRae and Quicksall also used their positions at TDA or TFIS to issue, approve or administer a series of consulting contracts in favor of Boyd and Koontz.  Those contracts totalled in excess of $170,000.  Multiple witnesses provided credible testimony that the work required by those contracts was either redundant or unnecessary, that the work was never performed, or that the contracts required consultation on matters beyond the jurisdiction of the contracting agency.  The defendants themselves testified only that the work performed under the contracts involved oral discussions about the subject matter of the particular contract, and visits with TDA and TFIS regulated businesses, and banks in which TFIS proposed to deposit funds.

There is no dispute that Boyd and Koontz were actively engaged in furthering Moeller's campaign.  The record contains overwhelming evidence that the primary purpose of the trips taken by Boyd and Koontz was political.  Throughout 1988, Quicksall, with the knowledge of Moeller and McRae, visited TDA and TFIS regulated businesses accompanied by Boyd, and on some occasions by Koontz. Boyd and Koontz financed some of those trips with agency funds furnished under their TDA and TFIS consulting contracts.  Numerous witnesses testified that Quicksall usually began these visits with agency business, but that the talk quickly turned to the subject of political contributions.  Campaign contributions were similarly elicited from TDA and TFIS employees, and officers of banking

5

institutions in which TFIS proposed to deposit funds.  Multiple donors testified that they felt compelled to chose between making a political contribution and receiving unfavorable treatment by TDA or TFIS.

In January 1989, Jim Hightower announced that he would not seek national office, and that he would instead seek another term as Texas Commissioner of Agriculture.  From January 1990 until at least May 1990, while Boyd and Koontz were still operating under contracts awarded or administered by the defendants in this case, Boyd and Koontz solicited campaign contributions for Hightower's campaign using similar tactics.

Defendant Mike Moeller was convicted on one count of misapplication of state funds, in violation of 18 U.S.C. § 666(a)(1)(A), and five counts of bribery, in violation of 18 U.S.C. § 666(a)(1)(B).  Defendant Peter McRae was convicted on one count of misapplication of state funds, in violation of 18 U.S.C. § 666(a)(1)(A), and three counts of bribery, in violation of 18 U.S.C. § 666(a)(1)(B).  Defendant Billie Quicksall was convicted on one count of misapplication of state funds, in violation of 18 U.S.C. § 666(a)(1)(A), and two counts of bribery, in violation of 18 U.S.C. § 666(a)(1)(B).  All three defendants were also convicted on a single count of conspiracy to commit those offenses, in violation of 18 U.S.C. § 371.

## A.  Sufficiency

Defendants first argue that the evidence was insufficient to support their convictions.  We disagree.  The record contains overwhelming evidence that the consulting contracts issued to Boyd and Koontz were sham contracts, and that little work was performed in return for the state funds paid by TDA and TFIS.  TDA and TFIS employees testified that they never consulted with either Boyd or Koontz, although the subject matter of the contracts concerned agency responsibilities within their area.  Other contracts were issued for consultation on areas outside the jurisdiction of the contracting agency.  Several contracts were issued for the single, non-specific purpose of "consulting on the joint operating agreement" between TDA and TFIS.  No written product was ever produced in exchange for the state funds paid Boyd and Koontz, which in the aggregate exceeded $170,000.  Even the defendants do not identify any work completed under the contracts, except visits to regulated businesses and service providers, and advice given orally to the defendants themselves.  The sham nature of the contracts alone is sufficient to support Moeller's conviction on count two for misapplication of TDA funds, and McRae's and Quicksall's conviction on count five for misapplication of TFIS funds.  18 U.S.C. § 666(a)(1)(A).

The heart of the defendants' sufficiency challenge is that the government failed to demonstrate any connection between the issuance of the consulting contracts in Boyd's and Koontz' favor,

and their independent campaigning work on behalf of Moeller. That connection is required to demonstrate both the defendants' agreement to violate the law on the conspiracy count, and the defendants' intent to be influenced or rewarded in connection with the contracts, on the bribery counts. 18 U.S.C. § 371; 18 U.S.C. § 666(a)(1)(B). Again, we disagree on this sufficiency challenge.

The record adequately supports the required inference that the essential purpose of the sham contracts was to compensate Boyd and Koontz for raising political contributions to benefit Moeller, and later Hightower. Boyd and Koontz traveled with Quicksall to visit TDA and TFIS regulated businesses on government time, using funds made available by the consulting contracts, for the purpose of soliciting campaign contributions. Moreover, the requests for campaign contributions were not made casually or in a manner that was incidental to the conduct of agency business. Quicksall, who was travelling in his capacity as an agency official, was at least once assigned the task of holding the money collected, and recorded contributions in the same small ledger used for agency business. Quicksall, who knew that Boyd and Koontz were asking $1,000 from each "target," was also aware that soliciting contributions in the context of agency business raised serious legal and ethical questions under Texas law. Indeed, Quicksall attempted to anticipate when the request for money was coming, and would try to extricate himself from the room before the request was made. Quicksall was not always successful in this effort, and numerous

8

representatives from regulated entities testified that they felt intimidated or coerced into contributing to Moeller's campaign.

Nor does the record support the defendants' argument that they were either unaware of, or uninfluenced by, the relationship between the sham contracts and Boyd's and Koontz's campaign solicitations. Two agency officials testified that Quicksall, who was obviously aware of the campaigning, told them on different occasions that the consulting contracts were unnecessary to agency business. However, one of those individuals testified that Quicksall had acknowledged that the contracts were politically motivated, and that he had to "deal with politics" as a part of his job with the agency.

McRae was heavily involved in both the administration of the consulting contracts, and in the management of funds received by BTA. McRae instructed other agency officials to approve invoices submitted by Boyd and Koontz without instructing them on the established procedure for being sure the work was performed. The record also demonstrates that McRae routinely gave information to substantiate the payment of these invoices "off the top of his head," without resort to any supporting documentation. The record also contains numerous exhibits documenting McRae's control over BTA funds. McRae withdrew more than $23,000 in cash from the BTA account. Although the purpose of those withdrawals could not be explained by defendant Moeller (McRae did not testify), he opined that some of the money was paid to McRae personally as a "management fee."

9

Moeller's and McRae's knowledge may also be inferred from circumstances surrounding the establishment of the PAC, maintenance of the accounts used to hold campaign contributions, and testimony indicating that they probably directed, and were at least aware of, Quicksall's travels with Boyd and Koontz. Quicksall testified that he acted on instructions from Moeller and McRae. McRae handled the bank accounts into which BTA funds were deposited. Moeller's secretary Nelda Trevino kept records of the political contributions received by BTA. Although Trevino testified that she kept the records at home, at least one TDA official testified that he had seen her writing BTA checks at her desk.

Moeller argues separately that he was unaware that Boyd and Koontz were engaged in political fundraising for his benefit at the same time they were being paid under TDA and TFIS consulting contracts. Moeller's own associate deputy commissioner testified at trial that he personally brought to Moeller's attention the fact that Boyd and Koontz were fundraising at the same time that they were acting under TDA and TFIS consulting contracts, and that such conduct might well be considered inappropriate. Tom Fordyce, another Moeller assistant, testified that Boyd and Koontz told him they were travelling to visit TDA and TFIS regulated businesses to raise political campaign funds for Moeller. Moeller himself wrote thank you notes for contributions received by BTA. Moreover, Boyd and Koontz frequently visited TDA, and Moeller's office in particular, during the relevant time period. Moeller's argument that he was unaware that consultants on important agency matters

10

who frequently visited his offices, were using his name, his employees, and his secretary to manage campaign funds for his benefit, is neither credible nor supported by the record.

All three defendants make additional challenges to the sufficiency of the evidence based on the temporal relationship between individual consulting contracts and the political solicitations of Boyd and Koontz. In one such example, the defendants claim that the August 1987 consulting contract, which was the subject of Moeller's and McRae's bribery conviction on count three and also supported Moeller's misapplication conviction on count two, could not have been issued for a political purpose because no fundraising took place until late that year when Hightower announced he would not seek reelection. We disagree. That premise ignores substantial record evidence demonstrating that all three defendants and Boyd were either aware that a PAC would be formed or participated in maintaining the funds deposited in BTA accounts. It also ignores the close temporal proximity between the initial consulting contracts and the time that the BTA PAC was established. In a similar argument, Quicksall challenges his convictions premised upon a February 1988 consulting contract because no fundraising was performed until summer 1988. This argument is likewise unpersuasive. Although the consulting contracts were of necessity signed on a given date, many of those contracts ran for a number of months, including months in which fundraising was being performed. Indeed, the August 1987 contract was signed only three days before performance under that contract,

11

which purportedly ran from July 1, 1987 through August 31, 1987, was to have been completed.

The record amply supports the jury's conclusion that the defendants were acting on their agreement to exchange state funds for Boyd's and Koontz' political efforts. Viewing the facts in a light most favorable to the jury's verdict, a reasonable trier of fact could have found all of the essential elements required to convict on each of the individual defendants' counts of conviction. **United States v. McCord**, 33 F.3d 1434, 1439 (5th Cir. 1994), cert. denied sub nom, 115 S. Ct. 2558 (1995).

## B. Evidentiary issues

Defendants contend that the district court's admission of evidence relating to Boyd's and Koontz' fundraising for Hightower was erroneous because the evidence demonstrated two distinct episodes of fundraising, rather than a single conspiracy as alleged in the indictment. Defendants argue they were unfairly prejudiced because the jury was poisoned by evidence that Boyd and Koontz engaged in strong-arm tactics on behalf of Hightower. Ironically, the defendants support this argument with evidence that Boyd and Koontz used tactics very similar to those employed on behalf of Moeller. We doubt the jury gave much consideration to the small amount of evidence relating to the Hightower fundraising. Indeed, Quicksall was acquitted on the only two counts charging bribery in relation to the Hightower fundraising. *Fed. R. Civ. P. 103(a);* **United States v. Skipper**, 74 F.3d 608, 612 (5th Cir. 1996) (error

12

may not be predicated upon a ruling admitting evidence unless a substantial right of the party is affected).

More importantly, all three defendants were continuously involved in the administration of consulting contracts in favor of Boyd and Koontz during the period when those gentlemen were raising funds for Hightower. The Moeller fundraising and the Hightower fundraising served the same purpose, that of keeping agency incumbents firmly entrenched. Because the co-conspirators, the purpose, and the methods employed for the Moeller fundraising and the Hightower fundraising were virtually identical, we have no trouble concluding that the evidence demonstrated a single conspiracy. See **United States v. DeVarona**, 872 F.2d 114, 118 (5th Cir. 1989) (factors considered in determining whether a single conspiracy was proven include the existence of a common goal or purpose, the nature of the scheme, and whether there are overlapping participants). The district court did not abuse its discretion by admitting evidence relating to the Hightower fundraising. **Skipper**, 74 F.3d at 612 (evidentiary errors are reversed for abuse of discretion).

Defendants also argue that the district court improperly admitted evidence of extrinsic bad acts without making the evidentiary findings required by **United States v. Beechum**, 582 F.2d 898 (5th Cir. 1978) (en banc), cert. denied, 99 S. Ct. 1244 (1979). See *Fed. R. Civ. P. 404(b)*. One such piece of evidence concerned the existence of a consulting contract issued to TDA general counsel Jesse Oliver, who was called to testify at trial by the

13

defense. The district court allowed the prosecution to question Oliver regarding the existence of the contract, but granted the defendants' Rule 404(b) objection by refusing to allow any evidence that the contract was improper. Defendants also complain about admission of evidence (1) showing the existence of another consulting contract issued by defendant McRae to gain political favor with a prominent individual, and (2) describing an incident in which Boyd and Koontz pressured a TDA employee to solicit a political contribution from the employee's father. As to these last two items of evidence, the defendants did not make any contemporaneous objection on Rule 404(b) grounds. The district court did, however, address the character of the challenged evidence in its ruling on the defendants' pretrial motion for Rule 404(b) notice. The district court found, and we agree, that the challenged evidence was simply further direct evidence relating to unindicted acts of the conspiracy. See **United States v. Aleman**, 592 F.2d 881, 885 (5th Cir. 1979) (Rule 404(b) principles are "inapplicable when some offenses committed in a single criminal episode become `other acts' because the defendant is indicted for less than all of his actions."). Because the challenged evidence was not extrinsic to the conspiracy, the district court's admission of that evidence was not error.

## 3. **Batson**

Defendants contend that the district court erred by overruling their **Batson** challenge to the prosecution's peremptory strike of three minority jurors -- two Hispanic and one African-American.

14

See **Batson v. Kentucky**, 106 S. Ct. 1712 (1986).  At trial, the prosecution articulated adequate race-neutral reasons for the peremptory strikes.  The prosecution claimed at trial that the length and complexity of the case required jurors with at least a high school education.  That policy was exercised across the board and resulted in the exclusion of both minority and non-minority panel members.  Of the three excluded minority jurors, two had about nine years of formal education, and the other had no formal education.  Additional reasons were offered as to two of the jurors.  The panel member with no formal education seemed to be having difficulty with the questions and was unable to competently fill out the juror questionnaire.  One of the remaining jurors also admitted that he had lied on tax forms.

We have previously recognized that the education of a panel member may be considered in the appropriate case.  See **United States v. Hinojosa**, 958 F.2d 624, 632 (5th Cir. 1992) ("a trial judge does not abuse his discretion by allowing exclusion of a venireman by peremptory strikes if that venireman's education is insufficient when taking into account the legal issues to be presented").  Defendants argue that **Batson** jurisprudence should recognize disparate education as a continuing badge of slavery.  We do not exclude the possibility that their argument may have merit in another case.  In this case, however, the complex nature of the conspiracy, and the number of interconnected offenses alleged, adequately support the district court's determination that the prosecution articulated adequate race-neutral reasons for the

15

peremptory strikes.  See **Hinojosa**, 958 F.2d at 631-32 (a trial judge's decision on a **Batson** issue is essentially one of credibility, which is entitled to great deference).

### III.  GOVERNMENT'S CROSS-APPEAL - SENTENCING

All three defendants were sentenced according to an adjusted offense level of 18 and a criminal history category of I, which specifies an applicable guideline range of 27 to 33 months. Defendant Moeller was sentenced to 27 months, the minimum within the applicable range, and was fined $ 56,000.  Defendant McRae likewise received the minimum sentence of 27 months and was fined $15,000.  Defendant Quicksall's sentence was reduced by the district court's finding of duress pursuant to U.S.S.G. § 5K2.12. Quicksall was sentenced to 12 months in prison and a fine of $8,000.

The district court calculated the offense level by assigning a base offense level of 8, a level falling between the two potentially applicable published guidelines, U.S.S.G. § 2C.1.1 covering bribery and U.S.S.G. § 2C1.2 covering gratuities.  The district court then adjusted the base offense level upward by 2 levels because the offense involved more than one transaction (U.S.S.G. § 2C1.1(b)(2)(A) or § 2C1.2(b)(2)(A)), and upward 8 levels based on the involvement in the offense of a high-level official (U.S.S.G. § 2C1.1(b)(2)(B) or § 2C1.2(b)(2)(B)).

Defendants Moeller and McRae moved for and were granted a stay of punishment pending appeal.  Defendant Quicksall surrendered to

16

prison authorities in December 1993, and completed his 12 month sentence in 1994.

On cross-appeal, the government contests the district court's application of the 1993 sentencing guidelines. <u>See</u> U.S.S.G. § 1B1.11. Specifically, the government challenges the district court's: (1) creation of a "compromise" offense level between the two potentially applicable published guidelines; (2) refusal to adjust Moeller's and McRae's offense level based on their role in the offense; and (3) departure downward for Quicksall on the basis of duress.

## A. Selection of a Compromise Guideline

At sentencing, the parties argued extensively about whether U.S.S.G. § 2C1.1 or U.S.S.G. § 2C1.2 was the guideline applicable to the conduct proven. Section 2C1.1 covers the offering, giving, soliciting or receiving of a bribe, and carries a base offense level of 10. Section 2C1.2 covers the offering, giving, soliciting or receiving of a gratuity, and carries a base offense level of 7. The statutory index to the sentencing guidelines provides that both provisions are potentially applicable to convictions under 18 U.S.C. § 666(a)(1)(B).

After struggling with the issue at length, the district court compromised by settling upon a base offense level of 8, reasoning that the offense conduct was somewhat more culpable than a mere gratuity, but somewhat less culpable than bribery. Anticipating difficulty with its selection of a base offense level not specified in a published guideline, the district stated in the alternative

that it would have "departed downward" in this case because (1) the defendants inherited a system of corruption that was not of their own devising; (2) the amount of money involved was, relatively speaking, not large; (3) the money collected was not intended for an unlawful purpose; and (4) the personal benefit to the individual defendants was indirect and insignificant.

The government contends that the district court was without authority to create a "compromise" base offense level. We agree. Title 18 U.S.C. § 3553 provides that the district court must impose a sentence within the range established by the Sentencing Commission for the applicable category of offense, unless the court expressly finds aggravating or mitigating factors that are not adequately taken into consideration by the guidelines. When the statutory index lists more than one potentially applicable guideline, the district court is charged with choosing from among the guidelines specified the one that is most appropriate based on the nature of the offense conduct. U.S.S.G. § 1B1.2, comment. n.1; U.S.S.G. App. A - Statutory Index at 369; see **United States v. Beard**, 913 F.2d 193, 197 (5th Cir. 1990).

While we are sympathetic to the district court's dilemma, we cannot sanction the creation of a compromise guideline provision merely because the case presents a difficult factual choice about which guideline should be applied. To do so would seriously erode the determinative nature and purpose of the sentencing guidelines. See generally, U.S.S.G. Pt. A (policy statement on basic approach of guidelines). That premise is particularly true when, as here,

18

the offense conduct is clearly contemplated by both potentially applicable guidelines.

Defendants offer no authority or argument in support of the district court's creation of the "compromise" base offense level. Instead, the defendants argue that the resulting sentence can be justified, either because the district court settled on U.S.S.G. § 2C1.1 (level 10) and departed downward for the articulated reasons, or because the district court settled on U.S.S.G. § 2C1.2 (level 7) and departed upward for reasons not articulated. The government makes an argument premised on the alternative holding as well, asserting that the mitigating factors articulated by the district court were improper, or in the alternative, that the district court's fact findings on those issues were clearly erroneous.

We will not consider the district court's alternative holding. The district court's selection of an erroneous base offense level resulted in application of an erroneous guideline range. That error cannot be cured by crafting an alternative holding which posits the operation of a departure on a correctly calculated guideline range. Nor is it clear from the transcript exactly which guideline provision the district court preferred. The court's statement that it would have departed downward, and its articulation of mitigating factors support the proposition that it favored § 2C1.1, the bribery provision. On the other hand, other statements by the district court, and its selection of a base offense level closer to 7, the level provided by § 2C1.2, strongly support the view that the court was leaning more towards the

19

gratuity guideline.  Nor will we accept the government's invitation to hold that 18 U.S.C. § 666(a)(1)(B) bribery convictions must be sentenced using U.S.S.G. § 2C1.1.  We do not read **United States v. Santopietro**, 996 F.2d 17, 20-21 (2d Cir. 1993), <u>cert. denied</u>, 114 S. Ct. 921 (1994) or **United States v. Mariano**, 983 F.2d 1150, 1158-60 (1st Cir. 1993) as establishing any such per se rule, and we decline to establish that rule in our own Circuit.  The applicable guideline in any given case is a fact-intensive determination to be made by the district court.

The sentencing guidelines charge the district court with the burden of selecting the guideline provision most applicable to the offense of conviction.  We decline to substitute our own more detached assessment of the extensive evidence presented by both parties for the judgment of the district court, particularly where to do so would require that we engage in conjecture about the basis of the district court's alternative holding.  <u>See</u> 18 U.S.C. § 3553 (requiring that the district court articulate reasons for departing from the applicable guideline range).  Remand for resentencing is appropriate.  On remand, the district court must select the appropriate guideline from among the potentially applicable published guidelines.  Once an applicable guideline range is established, aggravating or mitigating factors can be considered by the district court and the basis for any departure, whether upward or downward, can be articulated in accordance with 18 U.S.C. § 3553.

**B. Refusal to Adjust for Role in the Offense**

The PSR recommended a 4 level adjustment based on defendant Moeller's leadership role and a 3 level adjustment based on defendant McRae's supervisory role in the offense. See U.S.S.G. § 3B1.1(a) & (b). The district court denied that adjustment, essentially relying upon the same factors articulated in support of the district court's assignment of a compromise base offense level: (1) that the defendants had inherited a system of corruption; (2) that the system of corruption was not of their own devising; (3) that the relatively small amount of money involved was not intended for an unlawful purpose; and (4) that the personal benefit to the defendants was indirect and insignificant.

We review the district court's finding concerning Moeller's and McRae's role in the offense for clear error. **United States v. Buchanan**, 70 F.3d 818, 829 (5th Cir. 1995), cert. denied, 1996 WL 96864 (Mar. 25, 1996). Defendant Moeller occupied a high-ranking position within TDA, and was the political candidate for much of the fundraising involved in the offense. McRae was his assistant, and worked closely with Moeller in a variety of capacities. Nonetheless, the record as a whole does not support the conclusion that Moeller and McRae either initiated the bribery scheme or participated in a more culpable manner than other co-conspirators, with the possible exception of Quicksall. The defendants' "inheritance" of a historically corrupt and deep-rooted system is not immaterial. The continuance of the exact same conduct after Moeller announced he would not run for office indicates that the

21

scheme alleged was not dependent upon the managerial or leadership roles of these defendants, and depended instead largely upon the energy and creativity of Boyd and Koontz. See **United States v. Gadison**, 8 F.3d 186, 196 (5th Cir. 1993) (listing a defendant's involvement in the planning and organization of the offense as a relevant factor in determining a defendant's role in the offense). We affirm the district court's refusal to grant an upward adjustment based on Moeller's and McRae's role in the offense.

**C.  Downward departure for Duress - Quicksall**

Based on an adjusted offense level of 18 and a criminal history category of I (and leaving aside the error already discussed), Quicksall would have been subject to a sentence of between 27 and 33 months.  The district court sentenced Quicksall to 12 months only, departing downward based on its finding that Quicksall committed the offense under duress.  See § 5K2.12 (the court may decrease the sentence below the applicable guideline range if the defendant commits an offense because of serious coercion, blackmail or duress).

The district court considered Quicksall's age (60), his lack of an advanced education (some college), and his length of government service in concluding that Quicksall was economically and psychologically pressured by fear of career loss into following the orders he was given.  This is not the type of duress contemplated by § 5K2.12 of the sentencing guidelines.  "The Commission considered the relevance of economic hardship and determined that personal financial difficulties and economic

22

pressures upon a trade or business do not warrant a decrease in sentence." § 5K2.12.   Nor is the departure justified by the district court's additional observations concerning Quicksall's personal characteristics.   "One of the primary goals of the Sentencing Guidelines is to impose a sentence based on the crime, not the offender." **United States v. Vela**, 927 F.2d 197, 199 (5th Cir.), cert. denied, 112 S. Ct. 214 (1991); see, e.g., U.S.S.G. § 5H1.1 (age not ordinarily relevant when determining whether sentence should be outside applicable range).  The record does not support a downward departure on the basis of duress.  On remand, Quicksall should be resentenced without resort to § 5K2.12.

There is ample support in the record, however, for the district court's additional observations that Quicksall, for a variety of reasons, was plainly among the least culpable of those involved in the conspiracy.  That fact would support a 4 level downward departure on the basis that Quicksall was a minimal participant.  See U.S.S.G. § 3B1.2(a) & comment. 1; **Gadison**, 8 F.3d at 197.  Quicksall clearly had an inadequate understanding of the contracts-for-politics scheme, as compared to his superiors at TDA and TFIS and political consultants Boyd and Koontz.  As recognized by the district court, Quicksall's inability to grasp the finer points of the conspiracy was probably the reason he was selected for the role he played.  A defendant's lack of understanding or knowledge about the scope and structure of the criminal enterprise is indicative of a minor or minimal role in the offense. U.S.S.G. § 3B1.2 comment. 1.  **United States v. LaValley**, 999 F.2d 663, 665

23

(2d Cir. 1993). Quicksall filed timely objections to the PSR's failure to adjust the base offense level on the basis that he played a minimal role in the offense.

Quicksall must be resentenced without any departure for duress. Quicksall may, however, be entitled to either an adjustment of his offense level, or a departure from the applicable guideline range for other reasons, once the correct base offense level is determined. The district court is encouraged to reconsider the applicability of U.S.S.G. § 3B1.2 and U.S.S.G. § 3E1.1, and to make express findings of fact on those issues when resentencing Quicksall.

## CONCLUSION

There was sufficient evidence to support the jury's verdict. The district court did not commit reversible error by admitting certain evidence challenged as extrinsic to the offense or by overruling the defendants' **Batson** challenge to the prosecution's exercise of peremptory strikes. The defendants' convictions are AFFIRMED.

The district court erred by creating a "compromise" base offense level not specified in the guidelines. Moreover, the district court's downward departure as to Quicksall on the basis of duress is not supported by the record. The sentence imposed by the district court as to all three defendants is VACATED and the case is REMANDED to the district court for resentencing.